904 So.2d 269 (2003)
Elmer L. ELEY, M.D.
v.
MEDICAL LICENSURE COMMISSION OF ALABAMA.
No. 2010768.
Court of Civil Appeals of Alabama.
September 23, 2003.
Rehearing Denied March 12, 2004.
*272 Roger M. Monroe, Montgomery, for appellant.
Wayne P. Turner of Turner, Wilson & Sawyer, Montgomery, for appellee.
MURDOCK, Judge.
On August 21, 2000, Dr. Elmer Eley, a physician practicing in Guntersville at a medical clinic known as Express Care, was charged by the Board of Medical Examiners of Alabama ("the Board"), in an administrative complaint, with exhibiting "unprofessional conduct" in his medical practice in violation of § 34-24-360(2), Ala.Code 1975; with endangering the health of his patients in violation of § 34-24-360(3); with prescribing controlled substances for a reason other than a legitimate medical purpose in violation of § 34-24-360(8); and with performing unnecessary diagnostic tests, or medical or surgical services, in violation of § 34-24-360(11). The Medical Licensure Commission of Alabama ("the Commission") scheduled a hearing for January 24, 2001, on the Board's charges against Eley. In November 2000, Eley filed an answer, pro se, generally denying the charges that had been alleged against him. Thereafter, Eley obtained counsel and discovery was exchanged between the parties.
The hearing took place on January 24, 2001, as scheduled, and testimony was presented by several witnesses including Buddy Bunch, a Guntersville pharmacist; Kathy Ferrell, a custodian of records for Blue Cross Blue Shield; C.P., an undercover agent employed by the Alabama Bureau of Investigation acting on behalf of the Commission, who had been retained for the purpose of soliciting a controlled substance from Eley by posing as a patient and feigning an injury; B.B., another undercover agent employed by the Alabama Bureau of Investigation, who accompanied C.P. to Eley's office after hours to entice Eley with sexual overtures and to seek a *273 prescription for "diet pills";[1] and Richard Beverly, an emergency-room physician who testified in support of the charges alleged by the Board. The proceedings were continued to February 24, 2001, on which date Eley testified. Testimony was also presented on February 24, 2001, by Wayne Selvage, a registered nurse employed by Express Care, and by C.F., a patient of Dr. Eley.
After the hearing, the Commission entered an order dated March 7, 2001, revoking Eley's license. The order stated, in pertinent part:
"Evidence was presented to the Commission in the form of oral testimony and documents. Dr. Eley testified on his own behalf. Based upon such evidence, the Medical Licensure Commission makes the following findings of fact:
"1. The Respondent prescribed controlled substances which were inappropriate, not indicated, or for no legitimate purpose for the following patients: T.A., K.L., P.J.M., R.O., D.S., G.B., P.M[w]. and J.D.
"2. The Respondent prescribed controlled substances that were unnecessary, excessive, inappropriate, or for no legitimate medical purpose for the following patients: T.A., K.L., P.J.M., R.O., D.S., G.B., P.Mw., and J.D.
"3. The Respondent preformed unnecessary diagnostic tests, medical or surgical tests on the following patients: C.F., R.B., J.F., C.S., and S.L.
"Based upon the foregoing findings of fact, the Medical Licensure Commission makes the following conclusions of law:
"1. The Respondent has practiced medicine in such a manner as to endanger the health of his patients, in violation of Code of Alabama, Section 34-24-360(3).
"2. The Respondent has prescribed, dispensed, furnished, or supplied controlled substances to patients for reasons other than a legitimate medical purpose, a violation of Code of Alabama, Section 34-24-360(8).
"3. The Respondent has performed unneccessary diagnostic tests, medical or surgical services, in violation of Code of Alabama, Section 34-24-360(11).
"The Medical Licensure Commission specifically finds that the allegations in Paragraph 2(a) of the Administrative Complaint that the Respondent practiced medicine in such a manner as to engage in immoral, unprofessional or dishonorable conduct were not proved to the reasonable satisfaction of the Medical Licensure Commission and, accordingly, such allegation is dismissed."
Eley appealed the Commission's March 7, 2001, order revoking his medical license to the Circuit Court of Montgomery County ("the trial court") pursuant to § 34-24-367, Ala.Code 1975, and on March 19, 2002, the trial court entered a judgment affirming the Commission's order, including its revocation of Eley's medical license, notwithstanding the fact that the trial court considered the revocation of Eley's license "too harsh of a penalty." Eley filed a postjudgment motion that was denied by the trial court. Eley appeals.

Jurisdiction
Initially, the Commission contends that Eley failed to properly invoke the *274 jurisdiction of the trial court for three reasons: (1) the Commission asserts that Eley failed to file a timely notice of appeal with the Commission; (2) no cost bond was filed with the Commission in connection with the appeal; and (3) the Commission asserts that no petition for judicial review was filed with the trial court.
The applicable provisions of the Alabama Administrative Procedure Act, § 41-22-1 et seq., Ala.Code 1975 ("the AAPA"), pertinent to these issues are set out in § 41-22-20(b) and (d), Ala.Code 1975, which provide:
"(b) All proceedings for review may be instituted by filing of notice of appeal or review and a cost bond with the agency to cover the reasonable costs of preparing the transcript of the proceeding under review, unless waived by the agency or the court on a showing of substantial hardship.[[2]] A petition shall be filed either in the Circuit Court of Montgomery County or in the circuit court of the county in which the agency maintains its headquarters, or unless otherwise specifically provided by statute, in the circuit court of the county where a party other than an intervenor, resides or if a party, other than an intervenor, is a corporation, domestic or foreign, having a registered office or business office in this state, then in the county of the registered office or principal place of business within this state.
". . . .
"(d) The notice of appeal or review shall be filed within 30 days after the receipt of the notice of or other service of the final decision of the agency upon the petitioner or, if a rehearing is requested under Section 41-22-17, within 30 days after the receipt of the notice of or other service of the decision of the agency thereon. The petition for judicial review in the circuit court shall be filed within 30 days after the filing of the notice of appeal or review. Copies of the petition shall be served upon the agency and all parties of record. Any person aggrieved who is not a party may petition to become a party by filing a motion to intervene as provided in Section 41-22-14. Failure to file such petition within the time stated shall operate as a waiver of the right of such person to review under this chapter, except that for good cause shown, the judge of the reviewing court may extend the time for filing, not to exceed an additional 30 days, or, within four months after the issuance of the agency order, issue an order permitting a review of the agency decision under this chapter notwithstanding such waiver. Any notice required herein which is mailed by the petitioner, certified mail return receipt requested, shall be deemed to have been filed as of the date it is postmarked. This section shall apply to judicial review from the final order or action of all agencies, and amends the judicial review statutes relating to all agencies to provide *275 a period of 30 days within which to appeal or to institute judicial review."
Within the 30-day period for filing a notice of appeal as prescribed in § 41-22-20(d), Eley filed with the Montgomery County Circuit Court, and served upon the Commission, a document that began with a caption that included the names of the parties and of the court in which it was filed, and then read in substance as follows:

"NOTICE OF APPEAL
"Comes now the above styled defendant, Dr. Elmer L. Eley, M.D., and files this his notice of appeal as regards the order entered by the plaintiff, dated March 6, 2001, revoking his license to practice medicine in Alabama.
"Said order having been entered by the Medical Licensure Commission of Alabama by way of complaint file[d] by the Alabama Board of Medical Examiners.
"Done this the 3rd day of April, 2001."
The signature of Eley's attorney followed the foregoing, after which appeared the following "Certificate of Service" also signed by Eley's attorney:
"I hereby certify that a true and correct copy of the above said notice of appeal was served to the Medical Licensure Commission of Alabama and the Alabama State Board of Medical Examiners by placing same in the United States Mail, first class postage prepaid and properly addressed this 3rd day of April, 2001."
Reviewing each of the jurisdictional arguments made by the Commission, seriatim, we turn first to the Commission's argument that Eley failed to comply with the statutory requirement of filing a notice of appeal with the Commission within 30 days. Among other things, the Commission relies upon the opinion of the Court of Civil Appeals in Eitzen v. Medical Licensure Commission of Alabama, 709 So.2d 1239 (Ala.Civ.App.1998). Nonetheless, the Commission makes the following concession in its brief to this court: "Arguably, since a copy of the [document] was served on the Medical Licensure Commission within 30 days of its decision in this matter, such document could be construed as meeting the requirement for the filing of a notice of appeal with the agency." We agree.
In Eitzen v. Medical Licensure Commission of Alabama, the Court of Civil Appeals dismissed a physician's appeal of a trial court's judgment affirming the Commission's revocation of his license to practice medicine. Although the physician filed a petition for judicial review in the appropriate circuit court, this court concluded that he had not filed a notice of appeal with the agency within the statutorily required 30-day period. In a special concurrence, Judge Crawley wrote that "[e]ven if the petition for judicial review were treated as a notice of appeal, that notice of appeal would be untimely because, as [the main opinion] states, § 41-22-20(d) requires that a notice of appeal be filed within 30 days." 709 So.2d at 1240-41. The physician's petition for judicial review in Eitzen was filed with the circuit court more than 30 days after the Commission's decision.
The present case presents the following issue which, as highlighted by Judge Crawley's special writing, was not presented in Eitzen: When an appealing party files a petition for judicial review with the appropriate circuit court and, within 30 days after receipt of the notice of or other service of the decision of the agency being appealed, serves a copy of that petition upon the agency by first class mail, does this constitute the "filing" of a "notice of *276 appeal" with the agency for purposes of § 41-22-20(b)?
There is no indication in the Eitzen opinion that the petition for judicial review that was filed with the circuit court in that case was simultaneously served upon the Commission. Even if it had been, as Judge Crawley notes, that petition was filed beyond the 30-day period prescribed by § 41-22-20(d).
In the present case, however, the petition for judicial review was not only served upon the Commission, it was served within the required 30-day period. We therefore have been squarely presented in the present case with the question whether that service is sufficient to constitute a "filing" and the question whether, substantively, the petition itself is sufficient to constitute the required "notice of appeal." Based on our review of the petition, we conclude that both questions must fairly be answered in the affirmative.[3]
The second jurisdictional argument made by the Commission concerns the failure of Eley to have filed a cost bond with the Commission in conjunction with filing his notice of appeal. This court has held that the posting of security for costs within the statutory time limit is not a jurisdictional requirement for perfecting an appeal from an agency action. State Dep't of Human Res. v. Funk, 651 So.2d 12 (Ala.Civ.App.1994); Covin v. Alabama Bd. of Exam'rs in Counseling, 712 So.2d 1103 (Ala.Civ.App.1998). Therefore, we find no merit in the Commission's contention that Eley's failure to timely file a cost bond deprived the trial court of jurisdiction.
The Commission's final jurisdictional argument is that the "document" filed by Eley in the Montgomery Circuit Court was not a "petition for judicial review" as contemplated by § 41-22-20(d). The Commission's entire argument in this regard is a single sentence: "More importantly, no petition for judicial review was ever filed with the circuit court." The Commission does not explain what the document was lacking.[4] Nor does the Commission cite any authority in support of its argument that the document filed with the trial court was deficient. The trial court *277 and the Commission clearly treated the document as the required petition for judicial review. In fact, the Commission never raised with the trial court any question as to any alleged deficiency in the document; its bare statement to this effect in its brief on appeal to this court is the first time that it has raised this argument. It is apparent from the record that all of the grounds upon which Eley sought judicial review that could have been expressly raised in the petition, but were not, were "tried" by the implied consent of the parties before the trial court. See generally Rule 15(b), Ala. R. Civ. P.
Nowhere in § 41-22-20 does the Legislature state that a failure to file a petition for judicial review meeting all the requirements of § 41-22-20(h) is jurisdictional. To the contrary, § 41-22-20(b) provides that judicial review "may be instituted" by the above-discussed filing of a notice of appeal with the agency. Further, we note that § 41-22-20(d) speaks in terms of a "waiver" of the right to judicial review if the filing of a petition with the circuit court is not made in a timely manner and that it also speaks to the ability of the circuit court to extend the time for such a filing.
Finally, we also glean perspective as to this jurisdictional argument, as well as the other jurisdictional arguments raised by the Commission, from the legislative intent underlying the enactment of the AAPA and, particularly, the purpose the AAPA was intended to serve with respect to judicial review of an agency action:
"The AAPA is `intended to provide a minimum procedural code for the operation of all state agencies when they take action affecting the rights and duties of the public.' § 41-22-2(a)....
"The statute also provides that one of the purposes of the AAPA is `[t]o simplify the process of judicial review of agency action as well as increase its ease and availability.' § 41-22-2(b)(7)."
Hand v. State Dep't of Human Res., 548 So.2d 171, 173 (Ala.Civ.App.1988). Accordingly, we are unable to conclude that any of the alleged deficiencies in the manner in which Eley initiated judicial review of the Commission's action in this case rises to the level of a jurisdictional defect.

Discussion of the Merits of Eley's Appeal
We turn now to the merits of Eley's appeal. Judicial review of agency rulings in Alabama is confined to a review of the record. Ala.Code 1975, § 41-22-20(j). The Commission's order must be taken as "prima facie just and reasonable and the [reviewing] court shall not substitute its judgment for that of the [Commission] as to the weight of the evidence on questions of fact." § 41-22-20(k), Ala.Code 1975. See also Evers v. Medical Licensure Comm'n, 523 So.2d 414, 415 (Ala.Civ.App.1987).
Both our Supreme Court and this court have stated the general standard of review in such cases as follows:
"`Judicial review of an agency's administrative decision is limited to determining whether the decision is supported by substantial evidence, whether the agency's actions were reasonable, and whether its actions were within its statutory and constitutional powers. Judicial review is also limited by the presumption of correctness which attaches to a decision by an administrative agency.'"
Ex parte Alabama Board of Nursing, 835 So.2d 1010, 1012 (Ala.2001) (quoting Alabama Medicaid Agency v. Peoples, 549 So.2d 504, 506 (Ala.Civ.App.1989)). More specifically, in the present case, Dr. Eley contends that he is entitled to relief from the Commission's decision revoking his license to practice medicine based on the *278 provisions of § 41-22-20(k)(6) and (7), which provide for the reversal of an agency decision that is "(6) [c]learly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (7) [u]nreasonable, arbitrary, or capricious, or characterized by an abuse of discretion or a clearly unwarranted exercise of discretion."
The Commission found that Eley had violated § 34-24-360(3) and (8), Ala.Code 1975, primarily based on the manner in which he prescribed certain controlled substances. The Commission also found that Eley had violated § 34-24-360(11), Ala.Code 1975, which prohibits the performance of "unnecessary diagnostic tests or medical or surgical services."

Unnecessary Diagnostic Tests or Medical or Surgical Services
We turn first to the Commission's finding of a violation of § 34-24-360(11). Richard Beverly, an emergency-room physician from Fairhope, testified at the hearing in support of the charges the Board alleged against Eley. Specifically, the Board charged Eley with ordering unnecessary diagnostic tests or medical or surgical services to five named patients. A thorough review of the evidence pertaining to each patient reveals that the charges were not supported by substantial evidence:
1. C.F., a 57-year-old man, was treated by Eley on five occasions for bronchitis and sinusitis. Dr. Eley treated C.F. for those infections by injecting him with an antibiotic drug by the name of Rocephin. Beverly testified that he believed that Eley had administered an unnecessary treatment to C.F. because, in Beverly's opinion, "[t]here wasn't adequate documentation to indicate why the less expensive, more readily available antibiotics were not used," and that initially treating a patient's infection with Rocephin instead of a lower-priced oral antibiotic was "excessive." Eley explained that C.F. had serious immune deficiencies as a result of having worked at a poultry plant and that he suffered from prostatitis. C.F. testified at the hearing that he was employed as a sanitation worker at a poultry plant and that when he had an infection he responded immediately to Eley's injections and was able to return to work quickly.
In opining that Eley had provided excessive treatment to C.F., in violation of § 34-24-360(11), Beverly testified that there was inadequate documentation to support Eley's choice to treat C.F. with the more expensive, intramuscular antibiotic. Throughout the hearing, evidence was presented demonstrating that Eley maintained poor office records in that all of the documentation necessary to support Eley's diagnosis or the prescribed course of treatment was not consistently included in the patient records. However, poor medical-record documentation is not a basis for revoking a physician's license under § 34-24-360(11). See Oklahoma Bd. of Med. Licensure & Supervision v. Murphy, 964 P.2d 227 (Okla.Ct.App.1998).
2. Beverly testified that Eley treated R.B. with Rocephin on multiple occasions for sinusitis and bronchitis. Beverly further testified that R.B. was given injections of steroids on a few occasions for reasons he could not determine. R.B. had congestive heart disease and hypertension and her records indicated that Eley had prescribed Accupril, Digoxin, Aldactone, Lanoxin, and Lasix at various times during the course of Eley's treatment. Beverly testified that he was concerned about R.B.'s treatment because, he commented, the physical findings were minimal. Beverly testified:
"I could not tell, based on the record, whether she stayed on Accupril or not until December of [1999] at which time *279 she was referred to an endocrinologist. And the next visit that I saw documented in February of 2000 she said she wasn't on any medications at that point. So I don't know what happened between the time she was referred to the endocrinologist and the time she was seen again. My concern is the objective findings are  in the charts that I reviewed did not support the treatment with potentially dangerous drugs, Lasix and Lanoxin."[5]
We conclude that the evidence supports, at most, a charge of inadequate documentation; there is not substantial evidence to support the Commission's finding that Eley performed "unnecessary diagnostic tests or medical or surgical services" on R.B. in violation of § 34-24-360(11).
3. S.L. was seen by Eley in April 1999, complaining of a one-day history of neck pain. On physical exam, her neck was swollen and tender; no neurological deficits or radiating symptoms were noted. She had been involved in a motor-vehicle accident in February 1999, but she had reported no new trauma. However, cervical X-rays were performed, and they revealed degenerative joint disease in S.L.'s spine at the C6-7 area. Dr. Eley ordered an MRI. In answer to the question whether an MRI was necessary, Beverly replied, "That's awfully expensive and probably unnecessary." In answer to the question whether there were sufficient facts to justify an MRI at that point, Beverly replied, "Not in my experience based on someone with one day's worth of neck pain. I would consider that a person that deserved a trial of conservative therapy before an expensive MRI was obtained."[6] Beverly's opinion that the MRI was "probably unnecessary" was equivocal at best. We cannot conclude there was substantial evidence to support the Commission's finding that Eley had violated § 34-24-360(11) with respect to S.L.'s treatment.
4. Beverly testified that C.S. presented to Eley's office in February 1999 with a history of having fallen and with pain in her neck and that Eley ordered an MRI. Beverly testified that the medical record contained no evidence of a neurological finding that would justify the expense of an MRI.[7] We conclude that the evidence pertaining to C.S. supports a finding of inadequate documentation and not one of unnecessary treatment pursuant to § 34-24-360(11). Therefore, we conclude that there is not substantial evidence to support *280 a violation of § 34-24-360(11) with respect to Eley's treatment of C.S.
5. Beverly testified that he had no significant problems with Eley's treatment of J.F., except that he could not explain Eley's administration of an injection of SoluMedrol given J.F.'s discharge diagnosis of fatigue, tinnitus, and abdominal pain. Beverly testified that the documentation in J.F.'s chart failed to justify Eley's administration of that medication. Beverly admitted that poor documentation was his only complaint with respect to Eley's treatment of J.F. As we have previously stated, poor documentation is not a statutory ground for the revocation of a physician's medical license.
During his testimony, Eley gave the following explanation for his administration of more expensive intravenous antibiotics instead of the less costly oral antibiotics:
"The reason I use [intravenous] medication [is] twofold. One, these patients have already been treated by other people. These patients had things that I took into consideration that a lot of people had not taken into consideration. They had patients that were immune suppressed, that had had multiple hospitalizations, that their environment dictated that they have something else. The other thing that dictated that they have something else is that most of these patients that I have work in chicken factories. They're cold. They have a lot of disease. And what happens is that the routine medicines just do not work. I have tried giving people medications that were expensive, the microlites, the third-generation cephalosporins. These people can't afford it. They go to  go to the store; and when they get there, the pharmacist calls me back and they say they can't pay $70 or $80. These people are making $6 or $7 an hour. And what I had found was that I would give them some medicine that would make them get a blood level quicker, and then I could use something of a lesser value that would take care of their medical problems. It works out well. I don't know what to say except I thought I was doing my job."
The rules promulgated by the Commission define the "[p]erformance of unnecessary diagnostic tests or medical or surgical services" as
"[the administration of] medical tests or medical or surgical services which are not reasonably indicated or which are not reasonably required in order to ensure the well being of the patient of the practitioner, after considering all of the circumstances."
Ala. Admin. Code (Medical Licensure Comm'n), Rule 545-X-3-.01(k). As stated previously, in the treatment of four of the five patients as to which Eley had been charged with violating § 34-24-360(11), the evidence presented involved record-keeping deficiencies. As to the fifth patient, S.L., Eley explained that the "substantial" pain S.L. had complained of prompted him to obtain an MRI. We cannot say there was substantial evidence presented pertaining to S.L.'s treatment to demonstrate that Eley's treatment of her was not "reasonably required ... to ensure [her] well being." We conclude that the record does not contain substantial evidence to support the Commission's finding that Eley violated § 34-24-360(11).

Excessive Use of Controlled Substances
In its order revoking his license, the Commission also found that Eley had violated subsections (3) and (8) of § 34-24-360 with respect to the eight patients discussed below. These sections prohibit physicians from practicing medicine in such a manner as to endanger the health of their patients and from prescribing controlled *281 substances to a patient "for any reason other than a legitimate medical purpose."
1. T.A. presented to Eley with chronic lower-back pain and limited lumbar flexion; he was subsequently ruled disabled by the Veterans Administration in August 1988, and he underwent back surgery in December 1998. After surgery, T.A. suffered a severe wound infection. From March 1998 until February 2000, Eley treated T.A. in his office with Lortab and Xanax, prescribing 60 tablets of each drug, which, Eley testified, he considered to be a one-month supply. Beverly testified that Eley wrote those prescriptions more frequently than once a month; Beverly estimated that Eley wrote those prescriptions every two to three weeks. A discourse during the hearing between Eley and one of the Commission members addresses why the pain prescriptions that Eley had intended to control T.A.'s pain for a one-month period were not sufficient for that period of time, thus prompting T.A. to seek a refill before the one-month period had expired. The following exchange demonstrates that Eley actually prescribed a lower daily dose of Lortab to T.A. than the dose recommended by the Physician's Desk Reference ("the PDR"):
"DR. WEST: Do you know the PDR recommendation is to give [Lortab] every four to six hours for an adult?
"THE WITNESS: Yes, sir.
"DR. WEST: And yet you only prescribed it twice a day?
"THE WITNESS: Twice a day.
"DR. WEST: You gave these people, in your testimony previously, 60 [tablets], I think, with instructions to take it once or twice a day.
"THE WITNESS: Yes, sir.
"DR. WEST: Why would you do that? They only needed it twice a day?
"THE WITNESS: No, Some  some people, I tried to stretch the medicine so there wouldn't be a dependency on the medicine. And that was  the person that received that was T.A. And he was taking anti-inflammatory agents with it, too."
Eley testified in his deposition that he had treated T.A. for pain initially, because T.A. had not been able to afford surgery. Thereafter, Eley assisted T.A. in obtaining disability benefits from the Veteran's Administration. Eley testified that T.A.'s pain had become more severe after surgery as a result of a postoperative infection and then later completely disappeared. Eley testified that he had seen T.A. intermittently for pain management, even though the Veteran's Administration had also continued treating him and was also prescribing pain medication, because, Eley testified, the medicine prescribed at the Veteran's Administration did not control T.A.'s pain. Eley further testified that T.A. is currently fully recovered from his surgery, he is not drug dependent, and he is no longer in pain. T.A. filed an affidavit in which he testified that Eley had assisted him in obtaining surgical treatment for his lumbar disease at the Veteran's Administration hospital and that, since T.A. has recovered from that surgery, he has taken no pain medicine. We conclude that there is not substantial evidence that Eley prescribed narcotics for T.A. in such a manner as to endanger T.A.'s health or for a reason other than a legitimate medical purpose, in violation of either subsection (3) or subsection (8) of § 34-24-360.
2. Eley had treated K.L. for migraine headaches from September 1997 through February 1999 during 29 visits in which she had received an injection of Nubain and Phenergan; on 28 of those visits, K.L. also had received a prescription *282 for Lortab. She had been referred to a neurologist in Birmingham and saw Dr. Eley only for "breakthrough" pain.[8] When asked if it was "good medicine" to inject and give narcotics without trying alternative treatments for migraine headaches, Beverly replied, "not in my opinion." Beverly admitted that he had initially failed to notice in the medical record that Eley had referred K.L. to a neurologist. Eley explained at the hearing that patients typically have a difficult time obtaining an appointment with a neurologist on short notice. He testified:
"[A]nytime a patient has pain, they don't see [the neurologist]. [The neurologist] either refer[s] them to an emergency room or an urgent care center. And that's what I was, a substitute for the times that he could not see her."
K.L. filed an affidavit in which she stated that she had been a patient of the Ford Clinic in Birmingham for six years, that she had used Eley for "breakthrough pain," and that she had been very satisfied with the care that he gave her. We conclude that the Commission's findings that Eley prescribed controlled substances for K.L. in a manner that endangered K.L.'s health or for a reason other than a legitimate medical purpose were not supported by substantial evidence. The record indicates that K.L. was under the care of a neurologist for migraine headaches, and we do not find that the fact that Eley failed to explore alternative treatments for K.L. constitutes substantial evidence that he prescribed controlled substances in a manner that violated subsections (3) and (8) of § 34-24-360.
3. Beverly testified that in his opinion Eley's treatment of P.M. was "not good medicine" because Eley had prescribed controlled substances to treat P.M.'s pain instead of exploring alternative treatment. P.M. presented as a patient to Eley complaining of lumbar pain. Eley referred P.M. to Dr. James White, a Gadsden neurosurgeon, for a diagnostic study. Tests revealed that P.M. suffered from lumbar disk disease. Dr. White recommended surgery but P.M. could not afford it, so Eley prescribed narcotics for pain control. Eley testified that he prescribed more narcotics for P.M. than he normally would because P.M. installed carpet and tile floor coverings for a living and this work exacerbated his lumbar pain. P.M. filed an affidavit in which he testified that Eley had treated him at no cost for almost a year after he had become unable to work because of depression he had suffered in response to the brutal murder of his mother. We conclude that there is not substantial evidence to support the Commission's finding that Eley violated subsections (3) and (8) of § 34-24-360 with respect to his treatment of P.M.
4. R.O. presented to Eley with knee pain. Eley X-rayed both knees and discovered some osseous changes where the patellar tendon inserts into the tuberosity, as well as degenerative changes in the knee. Beverly testified that R.O.'s prescription profiles indicated that he received hydrocodone in 1999 on February 19 and 27, March 17, and April 14, and that there was no indication in the charts as to the reason for the prescription. Beverly testified that R.O. was prescribed Lortab, which contains hydrocodone, on three of those occasions and that on the fourth occasion, he was prescribed a cough syrup containing hydrocodone.
*283 R.O.'s medical records reflect that he saw Eley in November 1998 complaining of lumbar spasms and nasal edema. He was treated with Keflex, Stahist, Naprosyn, Flexeril, and Lortab, and he was given a cream to treat a rash. R.O. returned to Eley in April 1999, complaining of bilateral knee pain, which was worse on the right side. Nodules were noted in the patellar tendon. He was diagnosed with tendonitis and treated with Prednisone and Lortab.
R.O.'s final visit to Eley was on July 29, 1999. On that date, R.O. presented with a history of nervousness and headaches and admitted to Dr. Eley that he had become dependent on Lortab. Eley testified that he prescribed medicine to assist R.O. in accomplishing his expressed desire to end his dependency on Lortab. Dr. Eley prescribed 10 milligrams of Paxil, .5 milligrams of Xanax, and 50 milligrams of Arthotec. The prescription profile does not reflect that Eley prescribed any controlled medicines to R.O. after Eley learned of his substance-abuse problem. Further, each time Eley prescribed Lortab for R.O., R.O. expressed a legitimate complaint of pain, and, on one of those occasions, R.O.'s complaint of pain was supported by objective clinical findings. We therefore conclude that there was not substantial evidence to support the Commission's finding that Eley violated subsections (3) and (8) of § 34-24-360 with respect to R.O.'s treatment.
5. Eley first examined D.S. after D.S. had undergone seven surgical procedures on his back in an effort to resolve his pain. Dr. Beverly testified that D.S. was seen by Eley 50 times, that each time Eley had prescribed D.S. 30 Lortab tablets, and that on roughly half of the visits Eley also prescribed Xanax for D.S. Beverly testified that D.S. had undergone laminectomies in 1987, 1988, and 1989, and that in 1990 D.S. had had rods inserted; in 1996, D.S. had the rods surgically removed. Beverly stated that "I do not doubt that the man had real disease." When asked how he would respond if someone with a history of multiple surgeries repeatedly returned to him seeking relief from chronic pain, Beverly replied:
"Well, unfortunately, in my practice we have a lot of these people. Some of them are drug seekers, some of them have real pain. Both of them get referrals because I do not practice primary care medicine. They need to be followed by a specific physician who can care for their chronic pain. And typically they get referred to chronic pain specialists."
Beverly went on to say that this was an area in which a referral to a chronic-pain specialist was warranted. Eley testified that he prescribed pain medication for D.S. because the man did not want to have any more back surgery. He is not currently seeing D.S. because D.S. has suffered a stroke and has become homebound. In light of Beverly's admission that D.S. had real disease, and in light of D.S.'s extensive surgical history, we conclude that there is not substantial evidence to support the Commission's finding that Eley prescribed controlled substances for D.S. in violation of subsections (3) and (8) of § 34-24-360.
6. G.B. was diagnosed with cluster headaches. He was a patient at the Ford Clinic in Birmingham; however, he also consulted Eley for "breakthrough pain." At some point, Eley realized that G.B. had developed a substance-abuse problem; thereafter, Eley referred G.B. successively to several different pain clinics. Eley, on one occasion, had prescribed Methadone for G.B., but he stopped doing so after being informed by the Board that private physicians were prohibited from prescribing that drug; its use was limited *284 to pain clinics. G.B.'s medical records reflect that in September 1997 he underwent nasal surgery and was afterwards treated by Eley for postoperative pain with Lortab. Thereafter, on regular visits, Eley prescribed Lortab until December 1998. In January 1999, Eley referred G.B. to the Alabama Pain Clinic; in April 1999, Eley referred G.B. to another pain clinic. Beverly testified that Eley diagnosed G.B. as suffering from drug dependency in January 1999 and that G.B. was referred to three separate pain-management centers in February 1999, November 1999, and February 2000. A letter from a director of a pain-management center dated November 1999, which was addressed to Eley and contained in G.B.'s medical records, warned of potential hazards of hepatic damage if G.B. were to continue on the same level of Lortab he had been receiving. The medical records indicate that Eley continued to occasionally prescribe 30 7.5-milligram tablets of Lortab to G.B. after this date, although, in addition to prescribing Lortab, Eley continued to refer G.B. to pain clinics in an effort to assist him to become drug-free. Eley testified that he had prescribed Lortab for G.B. to enable G.B. to avoid dangerous withdrawal symptoms until he could be admitted into the pain clinic. Ultimately, Eley referred G.B. to Alabama Pain Clinic in Birmingham, where G.B. is now successfully being rehabilitated. Because the medical records indicate that Eley prescribed Lortab for G.B. after the time that he learned G.B. had a substance-abuse problem, we conclude that substantial evidence supports the Commission's finding that Eley prescribed controlled substances for G.B. for a reason other than a legitimate medical purpose and its conclusion that Eley violated subsections (3) and (8) of § 34-24-360.
7. Eley saw P.Mw. in June 1998 for back, flank, and chest pain. On further evaluation, P.Mw. was discovered to have osteomylitis of the T-8 and T-9 vertebrae. Eley prescribed narcotics until September 1998, when P.Mw. underwent a surgical resection of the T-8 and T-9 vertebrae in Birmingham. P.Mw. suffered a difficult "post-operative course" and required a second surgery. Eley saw P.Mw. again, beginning in October 1998, and he diagnosed P.Mw. with drug addiction at that time; however, Eley continued to prescribe Dilaudid for P.Mw. on several later October office visits. Beginning in November 1998, Eley attempted methadone therapy and continued that therapy until January 1999. In February 1999, Eley again began writing P.Mw. prescriptions for Dilaudid, and he also prescribed MS Contin for P.Mw. In March 1999, Eley began referring P.Mw. to pain-management clinics. Because the medical records indicate that Eley continued to prescribe narcotics for P.Mw. after he became aware of P.Mw.'s drug dependency, we conclude substantial evidence supports the Commission's finding that Eley violated subsections (3) and (8) of § 34-24-360 with respect to his treatment of P.Mw.
8. J.D. was a young female patient that Eley had treated in the clinic for routine respiratory infections. In August 1999, Eley had diagnosed her as being pregnant. Beverly testified that he had reviewed J.D.'s prescription profiles and that the profiles revealed that there were prescriptions for Cipro and Diflucan bearing Eley's name filled in November and December 1999; those dates correlated with dates included in the first trimester of J.D.'s pregnancy. Beverly testified that the drugs reflected on J.D.'s drug profile[9] *285 during the first trimester of her pregnancy were "Category C" drugs and had not been proven safe to administer to women in the first trimester of their pregnancy. Beverly testified that no office visit was documented regarding these prescriptions. J.D. testified in an affidavit included in the record that the last time she consulted Eley was August 12, 1999, when he diagnosed her pregnancy. She further testified that Eley had never phoned a prescription in for her or treated her in any manner after August 12, 1999. The actual prescription pertaining to these drugs was admitted into evidence. We conclude that the document is ambiguous, bearing the names of both J.D. and A.D., who is J.D.'s mother. Eley explained that he treated A.D. on December 15, 1999, for a urinary tract infection. Eley testified that J.D. had accompanied her mother to that appointment and that while in the examining room, J.D. had broken down into tears. Eley testified that he had begun to write a prescription for a sedative for J.D. to calm her; however, during the visit, J.D. managed to compose herself, and Eley decided against prescribing the medicine. Eley testified that all the medicines reflected on that prescription form  Cipro, Diflucan, and Darvon 65  were prescribed for A.D.
We conclude that there is not substantial evidence to support the Commission's finding that Eley prescribed controlled substances for a reason other than a legitimate medical purpose for J.D. Further, it is clear from the evidence presented that Bunch, the pharmacist, misinterpreted the ambiguous language contained on A.D.'s prescription form when he entered the information from that form on J.D.'s drug profile. J.D.'s affidavit testimony, in combination with the actual prescription and Eley's testimony, makes it clear that Eley never prescribed the "Category C" drugs for J.D. and that J.D. never received the drugs. We further conclude that there is not substantial evidence to support a finding that Eley's treatment of J.D. endangered the health or safety of J.D. in violation of § 34-24-360(3).
The rules promulgated by the Commission define a "legitimate medical purpose" as "a therapeutic treatment regimen or program generally recognized and accepted in the field of medical science as being safe and effective in the diagnosis, treatment, correction or alleviation of a specific medical condition of the patient under all relevant circumstances." Ala. Admin. Code (Medical Licensure Comm'n), Rule 545-X-3-.01(1)(i). Six of the patients whose treatment the Board had alleged violated § 34-24-360(8) were patients suffering severe pain either postsurgically or from a disease process in a case where surgical correction was not an option or was an option rejected by the patient. Substantial evidence did not indicate that Eley prescribed controlled substances in a manner that was not directed to alleviate a specific medical condition suffered by those six patients.
The Board has promulgated rules under the Alabama Uniform Controlled Substances Act, § 20-2-1 et seq., Ala.Code 1975, intended to serve as guidelines for physicians in prescribing pain medication. Contained within those guidelines is the following:
"Each case of prescribing for pain will be evaluated on an individual basis. The Board will not take disciplinary action against a physician for failing to adhere *286 strictly to the provisions of these guidelines, if good cause is shown for such deviation. The physician's conduct will be evaluated to a great extent by the treatment outcome, taking into account whether the drug used is medically and/or pharmacologically recognized to be appropriate for the diagnosis, the patient's needs  including any improvement in functioning  and recognizing that some types of pain cannot be completely relieved."
Ala. Admin. Code (Board of Med. Exam'rs), Rule 540-X-4-.08(1)(f). We also note that the record contains affidavits filed by pharmacists and physicians who practiced in Eley's community commending his professional abilities and the quality of his medical care.
The serious nature of professional disciplinary proceedings for a medical doctor cannot be minimized; findings that a physician has violated professional standards and the accompanying sanctions that result generate grave consequences, including loss of livelihood, diminished reputation, and professional dishonor. This court concludes that only two of the Commission's findings of violations by Eley  those pertaining to G.B. and to P.Mw.  are supported by substantial evidence.
We turn now to the issue of the sanction imposed by the Commission against Eley. It is undisputed in the record that, although Eley continued to prescribe narcotics to G.B. and P.Mw., he endeavored to refer both of those patients to pain clinics where they could receive the proper treatment. The rules promulgated by the Board under the Controlled Substances Act therefore provide further perspective as to Eley's prescribing practices for these two patients:
"A [physician seeking a narcotic certificate] may be considered to have excessively dispensed controlled substances if the Board finds that either the controlled substances were dispensed for no legitimate medical purpose, or that the amount of controlled substances dispensed by the [physician] is not reasonably related to the proper medical management of the patient's illness or conditions. Drug addiction shall not be considered an illness or condition which would justify continued dispensing of controlled substances, except in gradually decreasing dosages administered to the patient for the purpose of curing the addiction."
Ala. Admin. Code (Board of Med. Exam'rs), Rule 540-X-5-.03(1)1. The evidence reflects that Eley's prescription of narcotics to G.B. and P.Mw. after learning that they were drug dependent were not prescriptions of gradually decreasing dosages.
In its brief to this court, the Commission argues that, if its findings of fact regarding violations by Dr. Eley are supported by the evidence, "it is totally up to the Commission to set the punishment." (Emphasis added.) As support for this proposition, the Commission cites Justice Harwood's special concurrence in Ex parte Alabama Board of Nursing, 835 So.2d 1010 (Ala.2001). Based on that opinion, the Commission argues that "as long as the punishment is authorized by law, the choice of punishment is totally within the discretion of the Commission." (Emphasis added.)
The trial court likewise relied upon Ex parte Alabama Board of Nursing in deciding not to reverse the sanction imposed by the Commission against Dr. Eley:
"In this case, this Court is struggling with the same problem that it had in Ex parte Alabama Bd. of Nursing, [835 So.2d 1010 (Ala.2001)]. In that case, this Court found that the Board of Nursing's *287 recommendation to fire Nurse Stejskal was too harsh in light of the evidence presented. In [the present] case, the Court also believes that based on the conflicting evidence presented, it is too harsh of a penalty to revoke the license of Plaintiff Eley. There is definitely argument that there were some mistakes made or errors in judgment, however, this Court believes that a more appropriate punishment would be suspension of Plaintiff Eley's license. The Court, however, is bound by the decision of the Alabama Supreme Court in Ex parte Alabama Bd. of Nursing, supra, and is especially enlightened by Justice Harwood's concurrence in which he specifically addressed this Trial Court's role in deciding whether or not an administrative penalty is too harsh or not. As Justice Harwood pointed out in his concurrence, if substantial evidence has been presented and the decision is not arbitrary, capricious, or an abuse of discretion, the Court shall not be permitted to substitute its judgment regarding the penalty for that of the [Commission]. Again, this Court believes that the punishment was too harsh, but recognizes that it is required to follow the law and will do so."
(Emphasis added.)
Despite its finding that the punishment imposed by the Commission against Eley was too harsh, the trial court concluded that it was required to uphold that punishment  the revocation of Eley's license to practice medicine  because of our Supreme Court's opinion in Ex parte Alabama Board of Nursing. We conclude, however, that Ex parte Alabama Board of Nursing is distinguishable from the present case. As Justice Harwood emphasized in his special concurrence in Ex parte Alabama Board of Nursing, the Supreme Court's review of the Commission's decision to revoke a license to practice nursing in that case was under
"the special circumstance that [the court was] not reviewing an initial revocation, but rather a decision to revoke a probationary license. That circumstance warrants increased deference to the decision of the entity that granted the probation and has the responsibility of overseeing it and choosing an appropriate sanction for probation violation."
835 So.2d at 1016-17 (Harwood, J., concurring specially).
After carefully reviewing the record, we agree with the finding of the trial court that the sanction imposed was too harsh a penalty; we do not agree with the holding of the trial court that it was precluded from acting upon that finding. Because we conclude, based on the record presented, that the sanction imposed by the Commission revoking Eley's medical license was excessive and disproportionate to the wrong he committed, that sanction is due to be reversed.[10]
*288 Based on the foregoing, we reverse the judgment of the trial court except to the extent it upholds the Commission's findings that Dr. Eley violated subsections (3) and (8) of § 34-24-360 as they relate to his treatment of G.B. and P.Mw. We remand this case to the trial court for the entry of a judgment consistent with this opinion, directing the Commission to fashion a more appropriate sanction commensurate with these violations and the Commission's goal to ensure the safety of the public.
REVERSED AND REMANDED WITH INSTRUCTIONS.
YATES, P.J., and PITTMAN, J., concur.
THOMPSON, J., concurs in the result.
CRAWLEY, J., dissents.
CRAWLEY, Judge, dissenting.
I believe that the majority of this court has reweighed the evidence and substituted its judgment for that of the Commission. In addition, unlike the majority, I find the distinction between this case and Ex parte Alabama Board of Nursing, 835 So.2d 1010 (Ala.2001)  that Ex parte Alabama Board of Nursing dealt with the revocation of a probationary license, whereas this case deals with the revocation of a nonprobationary license  to be immaterial. I think that in either case "the choice of punishment is totally within the discretion of" the regulatory body. 904 So.2d at 286. Therefore, I respectfully dissent.
NOTES
[1] The Board's charge of unprofessional conduct, which the Commission ultimately concluded was not supported by the evidence, was based solely on the testimony of C.P. and B.B.
[2] Eley contends on appeal that the first sentence of § 41-22-20(b), providing for the institution of an appeal by the filing of a notice of appeal with the agency, is overridden by the more specific provision of § 34-24-367, Ala.Code 1975, providing for the filing in the Circuit Court of Montgomery County of any action commenced for the purpose of seeking judicial review of an administrative decision of the Commission. We consider this particular provision of § 34-24-367 as being intended to address where judicial review is to be commenced and maintained, not how it is to be commenced or maintained, particularly in light of the fact that this provision was in place at the time the Court of Civil Appeals decided Eitzen v. Medical Licensure Commission of Alabama, 709 So.2d 1239 (Ala.Civ.App.1998), discussed infra.
[3] As to the former question  whether the service at issue constitutes a "filing"  we take note of the following sentence in § 41-22-20(d):

"Any notice required herein which is mailed by the petitioner, certified mail return receipt requested, shall be deemed to have been filed as of the date it is postmarked."
Clearly, the Legislature contemplated that a "filing" could be accomplished by means of the delivery of the required notice through the mail. Although the mailing in the present case was not "certified mail return receipt requested," this only means that Dr. Eley is unable to take advantage of the provision in § 41-22-20(d) that the date he posted his notice to the Commission constitutes the date of its filing. This is of no consequence in the present case because the mailing was actually received by the Commission within the prescribed 30-day period.
We also note that, within a set of rules pertaining to the filing of various documents by professional corporations with the Medical Licensure Commission, are the following directions on how to file documents with the Commission:
"Documents which are required to be filed with the Medical Licensure Commission of Alabama should be addressed to Medical Licensure Commission of Alabama; 848 Washington Avenue, P.O. Box 887, Montgomery, Alabama, 36101-0887."
Ala. Admin. Code (Board of Med. Exam'rs), Rule 540-X-9-01(10) (emphasis added).
[4] The Commission does not assess the contents of the document in question in the context of the provisions of § 41-22-20(h), Ala.Code 1975, which describes the contents of a petition for review, nor even cite that Code section to us.
[5] At the February 2001 hearing, Eley testified that R.B. had multiple health problems and that he had referred her to a surgeon for pelvic surgery, to a cardiologist, and to a neurologist. When questioned about administering steroids, he responded that R.B. had experienced an allergic reaction to a medication and that he had used steroids in response to that reaction. R.B. stated in her deposition that she had been admitted to the hospital 12 times and that on 7 of those hospital admissions she had undergone surgical procedures; she stated that Eley's intravenous-antibiotic therapy helped her recover from infections much faster than oral-antibiotic therapy. R.B. saw a neurologist in Birmingham for migraine headaches, but Eley, whose office was much closer to R.B.'s home, treated her for "breakthrough" pain. Eley stated in his deposition that R.B.'s multiple hospital admissions had exposed her to resistant organisms and that her status as a smoker had lowered resistance to infections. Further, R.B. was a beautician and came in close contact with many people on a daily basis.
[6] Eley testified at the February 2001 hearing that because S.L.'s complaints of pain had been so substantial and there were degenerative changes on the X-ray he decided to do an MRI of her cervical spine to rule out further problems.
[7] Eley testified that C.S. had fibromyalgia and that he had ordered an MRI on her to rule out another "document[able]" disease.
[8] Eley's office was much closer to K.L.'s home than was the Birmingham neurologist's office.
[9] A drug profile is a computerized list of drugs prescribed and filled for a customer. Buddy Bunch, the pharmacist who filled the prescriptions, testified that he entered the information contained on the prescriptions he received into the computer in order to generate a drug profile. Bunch admitted that if he misread a prescription the wrong information would appear on a customer's drug profile.
[10] Sanctions imposed by licensing boards in other jurisdictions have been reversed for being manifestly excessive in relation to the need to ensure public safety. See Colorado Bd. of Med. Exam'rs v. Ogin, 56 P.3d 1233 (Colo.Ct.App.2002); Gant v. Novello, 754 N.Y.S.2d 746, 302 A.D.2d 690 (2003); License of Fanelli, 174 N.J. 165, 803 A.2d 1146 (2002); Guanzon v. State Med. Bd. of Ohio, 123 Ohio App.3d 489, 704 N.E.2d 598 (1997); Holladay v. Louisiana Bd. of Med. Exam'rs, 689 So.2d 718 (La.Ct.App.1997). In Alabama, there is also precedent for reversing an order of the Commission based on the fact that it is determined to be "too harsh a penalty." See Benton v. Alabama Bd. of Med. Exam'rs, 467 So.2d 234, 238 (Ala.1985) (Board's refusal to remove restrictions from doctor's substance-control certificate held to be "unduly harsh and oppressive" where the doctor's certificate had been initially restricted by the Board when she had admitted herself into treatment for addiction 25 years previously and no evidence existed that she had exhibited any problems with controlled substances since that time).