On Application for Rehearing
This court's opinion of March 11, 2005, is withdrawn, and the following opinion is substituted therefor:
The Alabama State Board of Medical Examiners (hereinafter "the Board") filed an administrative complaint before the Medical Licensure Commission of Alabama ("the Commission") against Pascual Herrera, Jr., M.D. In its complaint, the Board sought the revocation of Dr. Herrera's license to practice medicine in the State of Alabama. After conducting a hearing over the course of three days, the Commission, on April 25, 2001, entered an order making certain factual findings and ordering that Dr. Herrera's license to practice medicine in Alabama be revoked. Dr. Herrera timely appealed to the Circuit Court of Montgomery County (hereinafter "the trial court") pursuant to § 41-22-20, Ala. Code 1975.
The trial court entered a judgment on June 14, 2004,[1]
in which it reversed the April 25, 2001, order of the Commission and ordered that Dr. Herrera's medical license be reinstated. The Commission timely appealed to this court. For the reasons discussed below, we reverse the trial court's judgment.
The record on appeal contains more than 800 pages of transcribed testimony and a multitude of exhibits. That evidence reveals the following pertinent facts.
At the hearing before the Commission, the Board presented the testimony of two witnesses. One of the Board's witnesses was an investigator who explained the method by which the charts of four of Dr. Herrera's patients were randomly selected and reviewed by the Board's expert witness, Dr. Michael L. McBrearty. Dr. McBrearty is a family practitioner; he testified that he has approximately five patients on opiates or other narcotic pain medications. Dr. McBrearty testified that he typically referred chronic-pain patients to other doctors for treatment.
The evidence in the record focuses on Dr. Herrera's treatment of three of those four patients, namely, D.L., G.S.L., and J.W.D.L. first sought treatment from Dr. Herrera on August 15, 1996. D.L. informed Dr. Herrera that she had been involved in an automobile accident a week earlier and that she had been hospitalized in a rural hospital in Georgia for two days following that accident. D.L. informed Dr. Herrera that the rural hospital had only removed broken glass from her skin and hair and that no tests had been conducted on her during her hospitalization. However, it is undisputed that D.L. was given narcotic pain relievers during her stay at the rural hospital.
Dr. Herrera testified that at the time D.L. first sought treatment from him, she was in severe pain and distress as a result of her injuries, which included a broken vertebra and broken ribs. Dr. Herrera did not request the records from the hospital that had treated D.L. following her 1996 automobile accident. Rather, Dr. Herrera ordered a variety of tests to assess D.L.'s condition. Dr. McBrearty opined that the tests Dr. Herrera ordered were probably duplicative of tests that had, or should have, been conducted during D.L.'s two-day hospitalization.[2] *Page 921 
Dr. McBrearty also testified that during Dr. Herrera's initial treatment of D.L., as well as in subsequent visits, Dr. Herrera prescribed an excessive amount of narcotic drugs for D.L. Dr. McBrearty further testified that during Dr. Herrera's continued treatment of D.L., Dr. Herrera prescribed for D.L. an "unusual combination" of the medications Valium, Soma, Paxil, and Lortab; that Dr. Herrera often prescribed Tuss DS, a narcotic cough medicine that contains hydrocodone, in addition to those medications; and that those prescriptions constituted "a lot of medication." Dr. Herrera also prescribed D.L. up to three doses per day of the narcotic medication Percocet for "breakthrough pain." We note that on cross-examination Dr. McBrearty agreed that reasonable physicians could disagree whether D.L. needed narcotic pain medicine from the date of her initial treatment and that they could also disagree regarding the amount of narcotic pain medicine that Dr. Herrera had actually prescribed for D.L. However, Dr. McBrearty also testified, in response to questioning by the Commission members, that in addition to the other hydrocodone-based narcotic medications Dr. Herrera had prescribed for D.L., he had also consistently prescribed Tuss DS, the hydrocodone-containing narcotic cough medicine, for D.L. for two and a half years.
The record indicates that Dr. Herrera treated D.L. 65 times over the course of 31 months. Dr. McBrearty testified that that number of visits indicated that Dr. Herrera had treated D.L. unusually frequently and that there had been no need for Dr. Herrera to have treated D.L. as often as he did. Dr. Herrera treated D.L. weekly for approximately a year following her accident and every few weeks after that.
Dr. McBrearty also reviewed the tests Dr. Herrera performed on D.L. during those frequent visits, and he testified at length regarding the necessity of those tests, many of which he testified appeared to have been routinely performed. In summary, Dr. McBrearty believed that Dr. Herrera had a pattern of ordering or performing unnecessary tests on D.L., that the facts derived from D.L.'s patient chart did not always justify those tests, and that Dr. Herrera did not alter the course of his treatment of D.L. based on the results of the tests he did perform on her.
Dr. McBrearty also testified regarding Dr. Herrera's prescription of an anti-inflammatory medication for D.L. that has a side effect of causing gastrointestinal bleeding. In June 1997, after she had been taking the anti-inflammatory medication for some time, D.L. suffered a gastrointestinal bleed and later had surgery for a "massive gastric obstruction" on September 3, 1997. Dr. McBrearty first testified that Dr. Herrera had kept prescribing the anti-inflammatory medication between June and September 1997. However, on cross-examination, Dr. McBrearty admitted that he had initially overlooked the fact that other doctors who covered for Dr. Herrera during much of the time that he was out of work because of his injuries from a 1997 automobile accident had continued D.L. on that medication.[3] *Page 922 
Dr. Herrera resumed treating D.L. in late August 1997, shortly before her gastrointestinal surgery; however, he did not discontinue the prescription of the anti-inflammatory medication at that time.
Dr. Herrera testified that he believed that D.L. had already stopped taking the anti-inflammatory medication at the time he resumed treating D.L. in August 1997. Dr. Herrera testified that he was "close to 100 per cent certain" that D.L.'s chart inaccurately indicated that she was continuing to take the anti-inflammatory medication at that time. Dr. Herrera explained that he believed that his office staff had erroneously continued to include the anti-inflammatory medication in the list of medications D.L. was taking until October 1997, when he entered a specific order in D.L.'s patient chart discontinuing that medication. Dr. Herrera stated that he was having difficulty with his office staff during that time period, that an inaccurate patient chart was "definitely" a problem, and that "these little mistakes that can turn into a big mistake did happen."
Dr. McBrearty also took issue with Dr. Herrera's treatment of J.W., who Dr. Herrera had treated for low-back pain since September 11, 1996. Dr. McBrearty stated that Dr. Herrera treated J.W. frequently and that J.W. always presented with the same complaints, i.e., severe pain and a cough. J.W. smoked three and a half packs of cigarettes a day, and Dr. Herrera diagnosed him as having chronic obstructive pulmonary disease ("COPD"). In his testimony, Dr. McBrearty explained his conclusion that Dr. Herrera had prescribed too much narcotic medication for J.W. and his determination that Dr. Herrera had frequently ordered unnecessary diagnostic tests for J.W.
Dr. Herrera treated J.W. 83 times between 1996 and January 1999. Early in his treatment of J.W., Dr. Herrera referred J.W. to an orthopedic specialist who recommended that J.W. continue to be treated conservatively; Dr. McBrearty stated that conservative treatment does not include the prescription of narcotic pain medicine. Dr. McBrearty testified that in addition to the opiate or narcotic pain medication he continuously prescribed for J.W., Dr. Herrera consistently prescribed the hydrocodone-containing cough medicine, Tuss DS, for J.W.; Dr. Herrera indicated that the Tuss DS had been prescribed to treat J.W.'s COPD. Dr. McBrearty explained that it is rare for a physician to appropriately treat a lung condition such as J.W.'s with hydrocodone-containing cough medicines.
The third patient of Dr. Herrera's discussed during the hearing before the Commission was G.S.L. Dr. Herrera had treated G.S.L. for back pain since 1993, and he saw G.S.L. 56 times in 3 years. Dr. Herrera prescribed narcotic pain medication such as Vicodin and/or Lortab or Lorcet for G.S.L. at every visit. Dr. McBrearty testified that Dr. Herrera did not order a lot of unnecessary tests for G.S.L. However, Dr. McBrearty noted that G.S.L. was not covered by health insurance but was instead a "private pay" patient.
Dr. McBrearty concluded that the exams Dr. Herrera conducted on the patients whose charts he reviewed were insufficient because the medical histories on those patients were always similar or unchanging. Dr. McBrearty also opined that Dr. Herrera routinely ordered unnecessary diagnostic *Page 923 
tests and that he saw his patients too frequently in an effort to generate fees. Dr. McBrearty testified that it was unnecessary to see a chronic-pain patient every 10-14 days or every 2-3 weeks. Dr. McBrearty testified that seeing a chronic-pain patient every three months was sufficient, assuming that the treating physician believed the chronic-pain patient's subjective complaints and that the patient had the level of pain he or she claimed.
Dr. Daniel Brookoff testified on behalf of Dr. Herrera as an expert witness. Dr. Brookoff was unable to testify at the Commission hearing, so his deposition was taken after that hearing and submitted to the Commission members. Dr. Brookoff is board certified in internal medicine, and he specializes in the treatment of chronic-pain patients. Dr. Brookoff is the associate director of medical education and the associate director of the Comprehensive Pain Institute at Methodist Hospital in Memphis, Tennessee.
Much of Dr. Brookoff's deposition testimony was dedicated to his explanation of various theories pertaining to the treatment of chronic-pain patients. With regard to the specific facts of this case, Dr. Brookoff testified that he believed that Dr. Herrera's prescription of narcotic or opiate medications for the three patients at issue was appropriate given those patients' subjective complaints of pain and the documentation in their charts of certain physical conditions or clinical facts to support the prescriptions of those medications. Dr. Brookoff also testified that there was no evidence that Dr. Herrera improperly prescribed controlled medications because there was no evidence that Dr. Herrera's prescriptions allowed refills and because the frequent intervals of the appointments indicated that Dr. Herrera closely monitored the patients. According to Dr. Brookoff, Dr. Herrera's treatment of the three patients at issue fell within Alabama's "Guidelines for the Use of Controlled Substances for the Treatment of Pain," Rule 540-X-4-.08 (Ala. Bd. of Med. Exam'rs), Ala. Admin. Code.
Dr. Brookoff expressed no opinion with regard to whether Dr. Herrera performed unnecessary diagnostic tests on the three patients at issue; he stated that he did not review those patients' charts in order to form an opinion on that issue. On cross-examination, Dr. Brookoff conceded that the frequency with which the three patients saw Dr. Herrera was unusual. Dr. Brookoff indicated that he had seen some of his more difficult patients as frequently as once a week, but not for the length of time Dr. Herrera had seen his patients on a weekly basis. Dr. Brookoff stated that the fact that Dr. Herrera terminated 200 drug-seeking patients from his practice reinforced his opinion that Dr. Herrera's remaining chronic-pain patients were seeking treatment in good faith. However, Dr. Brookoff admitted that it did concern him that as many as 200 suspected drug-seekers sought treatment from Dr. Herrera. Dr. Brookoff was also concerned that Dr. Herrera routinely prescribed hydrocodone-containing cough medications in conjunction with other opiate or narcotic medications; he stated that it was not his practice to do so because "[i]t is almost like giving an additional [opiate or narcotic] in a different form of the medication."
The legibility of Dr. Herrera's patient charts was also an issue during the hearing. We note that other than asserting that the doctors who covered his practice after his 1997 automobile accident had not been unable to read his handwriting, Dr. Herrera made no objection concerning the Commission's consideration of that issue. Dr. Herrera testified that his staff had generally had no difficulty in reading his handwriting. *Page 924 
However, both expert witnesses had difficulty evaluating the patient charts because of Dr. Herrera's handwriting. Dr. McBrearty was unable to decipher some portions of Dr. Herrera's treatment notes. Dr. Herrera's attorney cross-examined Dr. McBrearty, often effectively, while translating portions of the patient records that Dr. McBrearty had initially been unable to read. However, we note that an objection made by the Board's attorney indicated that Dr. Herrera was reading those charts and translating his handwriting for his attorney during that questioning. Dr. McBrearty testified that he did not believe that, in most instances, Dr. Herrera's records were sufficiently legible to ensure a good continuity of patient care.
Further, Dr. Herrera's own expert, Dr. Brookoff, testified that legibility of a patient's chart was important. Dr. Brookoff stated that in his initial review of Dr. Herrera's patient charts he could not read a number of words from those charts. Dr. Brookoff explained that Dr. Herrera provided him a typed narrative of the patient charts and that he relied on those typed narratives to decipher some portions of those charts. We note that Dr. Brookoff testified that approximately 85% of the typed narrative was taken verbatim from the patient charts he reviewed but that the remainder of those typed narratives contained editorial comments made by Dr. Herrera.
Dr. Herrera testified at length during the hearing before the Commission. Dr. Herrera is a family practitioner whose practice focuses on pain management. Dr. Herrera stated that he had completed some study-at-home courses and continuing-education courses in the field of pain management.
Dr. Herrera admitted that after he hired a new office manager in September 1999 she assisted him in terminating 200 patients from his practice on the basis that those patients were "drug seekers." Dr. Herrera stated that 90% of his practice involved the treatment of chronic-pain patients. Dr. Herrera stated that, not including the 200 patients he had terminated from treatment, he treated approximately 800 patients during an average month.
Dr. Herrera testified at length regarding his treatment of D.L., J.W., and G.S.L. He explained that he believed that seeing those patients frequently and prescribing medications in small amounts would enable him to closely monitor those patients, and, as a result, that it would make treatment progress better. Dr. Herrera also stated that he believed that if he saw his patients often and gave them prescriptions for controlled medications in small enough quantities to carry the patient only until his or her next appointment, he would avoid any inquiries into his prescription of those narcotic or opiate medications. Dr. Herrera testified that he now believed that the reason D.L. and his other patients returned for medications so often was because the patients were not getting adequate pain relief from the medications he prescribed. Dr. Brookoff, in his testimony, explained that chronic-pain patients are sometimes mistaken for drug seekers if the levels of medications they are prescribed do not alleviate their level of pain.
Dr. Herrera also testified regarding the reasons he believed the diagnostic tests and controlled-substance medications he ordered for the three patients at issue in this matter were necessary. Dr. Herrera insisted that he had done his best to conform to Alabama's "Guidelines for the Use of Controlled Substances for the Treatment of Pain." He stated that he had never intended to prescribe medications or order diagnostic tests that were unnecessary or inappropriate or for other than a legitimate medical purpose. *Page 925 
The members of the Commission were also provided the opportunity to question the parties' witnesses during the hearing before the Commission. Several of the Commission members questioned Dr. McBrearty during his testimony at the hearing, primarily on the subject of Dr. Herrera's treatment of D.L. Some of those questions contained medical terms of art. The members of this court are not members of the field being regulated and have no medical expertise or training. Therefore, this court was not always able, as would be the members of the Commission, to appreciate the significance of the Commission members' questions of the witnesses or the answers those witnesses provided. Most of the answers to the Commission members' questions, however, were clear. For example, Dr. McBrearty testified that patients with COPD or restrictive-lung disease were "hardly ever" treated with hydrocodone-containing cough medications such as Tuss DS, which Dr. Herrera had routinely prescribed for both D.L. and J.W. Also, Dr. McBrearty indicated that unless a patient suffers catastrophic injuries most automobile-accident patients such as D.L. do improve or get better over time and become asymptomatic; the record does not indicate that D.L.'s symptoms or complaints improved during the course of her treatment. We also note that one of the Commission members indicated that he would search through the voluminous medical-record exhibits in order to find the answers to some of the questions he had.
The members of the Commission also questioned Dr. Herrera about his treatment of the three patients at issue in this matter. Many of the Commission members' inquiries were in response to Dr. Herrera's testimony and questioned certain claims or treatment decisions Dr. Herrera had made. For example, in response to a question whether he "really believe[d] that Cortisone causes diabetes after one injection or two?", Dr. Herrera answered yes, that he had found that to be true in his practice. As another example of that line of questioning, a Commission member also questioned Dr. Herrera about, and expressed concern about, Dr. Herrera's failure to conduct a pelvic exam on D.L. or to refer D.L. to another doctor for a pelvic exam in response to her continued complaints of chronic back pain. The Commission members also questioned Dr. Herrera concerning the necessity of the tests he had routinely ordered on his patients and whether those tests were proper under the conditions presented.
The Commission argues that the trial court erred in applying a "preponderance of the evidence" standard to the Commission's order, rather than applying the "substantial evidence" standard. The Alabama Administrative Procedure Act ("the AAPA"), § 41-22-1
et seq., Ala. Code 1975, governs judicial review of the Commission's decision. Under the AAPA, the trial court may reverse an administrative decision such as the Commission's April 25, 2001, order only under limited circumstances:
 "(k) Except where judicial review is by trial de novo, the agency order shall be taken as prima facie just and reasonable and the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. . . . The court may reverse or modify the decision or grant other appropriate relief from the agency action . . . if the court finds that the agency action is due to be set aside or modified under standards set forth in appeal or review statutes applicable to that agency or if substantial rights of the petitioner have been prejudiced because the agency action is any one or more of the following: *Page 926 
 "(1) In violation of constitutional or statutory provisions;
 "(2) In excess of the statutory authority of the agency;
"(3) In violation of any pertinent agency rule;
"(4) Made upon unlawful procedure;
"(5) Affected by other error of law;
 "(6) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 "(7) Unreasonable, arbitrary, or capricious, or characterized by an abuse of discretion or a clearly unwarranted exercise of discretion."
§ 41-22-20(k), Ala. Code 1975 (emphasis added). In discussing the standard for judicial review of a Commission decision, our supreme court has stated:
 "Our review of the Commission's order is controlled by § 41-22-20(k), Ala. Code 1975. Section 41-22-20(k) states: `[T]he [Commission's] order shall be taken as prima facie just and reasonable and the [reviewing] court shall not substitute its judgment for that of the [Commission] as to the weight of the evidence on questions of fact.' See also Evers v. Medical Licensure Comm'n, 523 So.2d 414, 415 (Ala.Civ.App. 1987). This Court has further defined the standard of review of an agency ruling in Alabama as follows:
 "`"Judicial review of an agency's administrative decision is limited to determining whether the decision is supported by substantial evidence, whether the agency's actions were reasonable, and whether its actions were within its statutory and constitutional powers. Judicial review is also limited by the presumption of correctness which attaches to a decision by an administrative agency."'
 "Ex parte Alabama Bd. of Nursing, 835 So.2d 1010, 1012 (Ala. 2001) (quoting Alabama Medicaid Agency v. Peoples, 549 So.2d 504, 506 (Ala.Civ.App. 1989))."
Ex parte Medical Licensure Comm'n of Alabama, 897 So.2d 1093,1097 (Ala. 2004) (emphasis added). Our supreme court has defined the term "substantial evidence" as "`"evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved."'" Ex parte Medical Licensure Comm'n of Alabama,897 So.2d at 1097 (quoting Ex parte Bowater, Inc., 772 So.2d 1181,1182 (Ala. 2000), quoting in turn West v. Founders LifeAssurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989)). InEvers v. Medical Licensure Commission, 523 So.2d 414, 415
(Ala.Civ.App. 1987), cited by our supreme court in Ex parteMedical Licensure Commission of Alabama, supra, this court noted that "[w]e may not substitute our judgment for that of the agency as to the weight of the evidence or question of fact, nor could the circuit court substitute its judgment for that of the Commission." In addition to the foregoing, we note that there is no presumption of correctness afforded to the Commission's legal conclusions or its application of the law to the facts.Barngrover v. Medical Licensure Comm'n of Alabama,852 So.2d 147, 152 (Ala.Civ.App. 2002).
In its June 14, 2004, judgment, the trial court stated, among other things, that it was the duty of the Board to prove by a "preponderance of the evidence" the charges it had asserted against Dr. Herrera. The trial court then stated, as it did several other times in its judgment, that it must determine if substantial evidence existed to support the factual determinations and conclusions contained in the Commission's April 25, 2001, order. In reviewing the Commission's order, the trial court examined whether the Commission's determinations *Page 927 
were supported by substantial evidence, as is required by Exparte Medical Licensure Commission of Alabama, supra, and Exparte Alabama Board of Nursing, 835 So.2d 1010 (Ala. 2001). We conclude that there is no merit to the Commission's argument that the trial court failed to apply the appropriate standard of review in its examination of the Commission's April 25, 2001, order.[4]
The Commission also argues on appeal that the trial court erred in determining that the Commission's order revoking Dr. Herrera's medical license pursuant to § 34-24-360, Ala. Code 1975,[5]
was not supported by substantial evidence. In its April 25, 2001, order, the Commission made the following factual findings and legal conclusions in determining that Dr. Herrera had violated certain provisions of § 34-24-360:
 "This matter is before the Medical Licensure Commission upon an Administrative Complaint filed by the Alabama State Board of Medical Examiners seeking to revoke or otherwise discipline the license to practice medicine in Alabama of the Respondent, Pascual Herrera, Jr., M.D. A hearing in this matter was commenced on February 28, 2001, and was continued on March 28 and March 29, 2001. The Respondent was present, together with his attorney, Algert S. Agricola, Jr., Esq. James R. Cooper, Esq., represented the Board of Medical Examiners. Wayne P. Turner, Esq., served as hearing officer.
 "Evidence was received by the Commission on February 28, March 28, and March 29, 2001, in the form of oral testimony and documents. In addition, the Medical Licensure Commission received and considered the deposition of Daniel Brookoff, M.D., which, in accordance with the Commission's order of April 4, 2001, was submitted to the Commission subsequent to March 29, 2001. Dr. Herrera testified in his own behalf.
 "Based upon such evidence, the Medical Licensure Commission makes the following findings of fact:
 "1. [Dr. Herrera] failed to perform adequate histories and physicals on patients J.W., [G.S.L.], and D.L. He performed unnecessary diagnostic tests upon such patients and his medical notes and records with regard to such patients were illegible and inadequate. Further, Dr. Herrera prescribed controlled substances to patients J.W., [G.S.L.], and D.L., in excessive amounts, without medical justification, and without adequate *Page 928 
documentation for the necessity of the amount of narcotics prescribed.
 "2. [Dr. Herrera] performed unnecessary diagnostic tests upon patients J.W., [G.S.L.], and D.L.
 "Based upon the foregoing Findings of Fact, the Medical Licensure Commission makes the following Conclusions of Law:
 "1. [Dr. Herrera] has practiced medicine in such a manner as to endanger the health of his patients, [which constitutes] a violation of § 34-24-360(3), Ala. Code 1975.
 "2. [Dr. Herrera] has prescribed, dispensed, furnished or supplied controlled substances to individuals for other than a legitimate medical purpose, [which constitutes] a violation of § 34-24-360(8), Ala. Code 1975.
 "3. [Dr. Herrera] has performed unnecessary diagnostic tests or medical or surgical services, [which constitutes] a violation of § 34-24-360(11), Ala. Code 1975.
 "Having considered the evidence in this case, including, especially, the questions of the Commissioners to Dr. Herrera and his responses thereto, the Medical Licensure Commission is gravely concerned about Dr. Herrera's basic knowledge of medicine and about his ability to exercise appropriate medical judgment. Because of such concern, and because of the foregoing findings of fact and conclusions of law, it is the opinion of the Medical Licensure Commission that Dr. Herrera should not be allowed to continue to practice medicine. Accordingly, it is the ORDER of the Medical Licensure Commission that the license to practice medicine in Alabama of the Respondent, Pascual Herrera, Jr., M.D., be and the same is REVOKED."
(Emphasis added.)
Before we can address the merits of the Commission's argument that the trial court erred in reversing its decision, we must first address certain legal determinations made by the trial court in its judgment. While the Commission's April 25, 2001, order contains both factual findings and legal conclusions, that order does not specify what facts the Commission relied on in reaching each of its legal conclusions. In finding that the Commission's April 25, 2001, order was not supported by substantial evidence, the trial court several times found that the Commission had made erroneous factual determinations and that it had erred "as a matter of law" in basing its decision on those purportedly erroneous factual determinations. As noted earlier in this opinion, there is no presumption of correctness afforded that part of the Commission's order pertaining to its legal conclusions. See Barngrover v. Medical Licensure Comm'n ofAlabama, supra.
The trial court first determined that the Commission's factual finding that Dr. Herrera's patient charts were illegible could not, "as a matter of law," serve as a basis of support for any of the Commission's findings. In reaching that conclusion, the trial court cited Eley v. Medical Licensure Commission of Alabama,904 So.2d 269, 278 (Ala.Civ.App. 2003), in which this court held, among other things, that "poor medical-record documentation is not a basis for revoking a physician's license under § 34-24-360(11)"; section 36-24-360(11) is the subsection that allows the Commission to suspend or revoke a doctor's medical license if it determines that the doctor performed unnecessary diagnostic tests or medical services. In Eley, supra, this court held that the evidence in that case did not support a conclusion that the doctor had performed unnecessary diagnostic tests or provided unnecessary medical services and that, at most, the evidence indicated only that the doctor did *Page 929 
not properly document in his patients' charts the need for the medications he prescribed. Eley, 904 So.2d at 278-80. The portion of Eley, supra, relevant to this issue addresses only the sufficiency of documentation in a patient's medical chart; it does not specifically address the issue of the legibility of a patient's medical chart. As Dr. McBrearty pointed out in his testimony before the Commission, the ability of other medical providers to read a medical chart can affect the continuity of patient care. In its order, the Commission did not specify which charge or charges it concluded were supported by the evidence pertaining to the legibility of Dr. Herrera's patient charts. Given the facts of the case, the charges against Dr. Herrera, and the lack of argument on this issue in the parties' briefs on appeal, we are not willing to expand the holding of Eley, supra, to conclude that, as a matter of law, evidence pertaining to the legibility of patient charts cannot serve as a basis for revoking a medical license. Therefore, we must conclude that the trial court erred in finding that, "as a matter of law," the legibility of Dr. Herrera's patient charts was not relevant to the charges against him.
The trial court, again citing Eley, supra, also concluded that the Commission's factual finding that Dr. Herrera's patient charts were inadequate could not, "as a matter of law," support the revocation of Dr. Herrera's medical license. We note that this court has not addressed the issue whether inadequate documentation in a medical file might support charges under subsections of § 34-24-360, Ala. Code 1975, other than §34-24-360(11); because the parties in this case have not presented an argument on that subject, we do not address it in this opinion. We conclude, however, that any error the Commission might have made in relying on the issue of inadequate documentation as a basis for revoking Dr. Herrera's license with regard to § 34-24-360(11), in contravention of this court's recent holding in Eley, supra, is, at most, harmless. See
Rule 45, Ala. R.App. P. Further, the facts of this case are distinguishable from those of Eley, supra. In this case, as distinguished from Eley, supra, the issue of inadequate documentation in a patient's file was not the sole evidence presented on the issue whether Dr. Herrera performed unnecessary diagnostic tests or provided unnecessary medical services for his patients.[6]
In concluding that the evidence did not support, "as a matter of law," the Commission's determination that Dr. Herrera had ordered unnecessary diagnostic tests, the trial court cited evidence that was most favorable to Dr. Herrera. However, that evidence was disputed, and it was not the province of the trial court in this case to resolve the disputes in that evidence or to reweigh the evidence. See Ex parte Medical Licensure Comm'n ofAlabama, supra (holding that it is the function of the Commission, as the trier of fact, to resolve conflicts in the evidence). The trial court erred in concluding that the disputed evidence did not support, "as a matter of law," the Board's charge that Dr. Herrera ordered unnecessary diagnostic tests for his patients. *Page 930 
Similarly, the trial court relied on evidence presented by Dr. Herrera to discredit Dr. McBrearty's opinion that Dr. Herrera treated the three patients at issue too frequently and to conclude that, as "a matter of law," the evidence that Dr. Herrera saw his patients too frequently did not support the Board's charges against Dr. Herrera. We conclude, however, that Dr. McBrearty's testimony, in addition to other evidence submitted to the Commission, was relevant to the inquiry whether Dr. Herrera had provided unnecessary medical services to his patients. See § 34-24-360(11), Ala. Code 1975.
We also conclude that the trial court erred in finding that the evidence did not support, "as a matter of law," the Commission's determination that Dr. Herrera had practiced medicine in a manner that endangered his patients' health, see § 34-24-360(3), Ala. Code 1975. In reaching that finding, the trial court cited only the evidence pertaining to Dr. Herrera's prescription to D.L. of the contra-indicated anti-inflammatory medication. As already stated in this opinion, the Commission did not cite specific facts to support its conclusion that Dr. Herrera had practiced medicine in a manner that might endanger his patients' health. Thus, it appears that the trial court, in rejecting the Commission's legal conclusions, speculated that the Commission had relied only on the evidence pertaining to the anti-inflammatory medication. However, "this Court will assume that the [trier of fact] made those findings necessary to support the [order]." Transamerica Commercial Fin. Corp. v. AmSouthBank, N.A., 608 So.2d 375, 378 (Ala. 1992). The Commission had before it other evidence, including evidence tending to indicate that Dr. Herrera's prescription of narcotic medications for his patients was excessive or inappropriate, that tended to provide legal support for its conclusion that Dr. Herrera had endangered his patients' health.
The trial court also concluded that the Commission erred "as a matter of law" in relying on the testimony of Dr. McBrearty rather than on the testimony of Dr. Brookoff in finding that Dr. Herrera had improperly prescribed controlled substances for his patients in violation of § 34-24-360(8), Ala. Code 1975.[7]
In reaching that conclusion, the trial court made the evidentiary determination that Dr. Brookoff was "imminently more qualified" than was Dr. McBrearty to evaluate Dr. Herrera's treatment of the three patients at issue in this matter. However, the evaluation of the qualifications of expert witnesses is a matter normally confined to the discretion of the trier of fact. Redi RoastProds., Inc. v. Burnham, 531 So.2d 664 (Ala.Civ.App. 1988); seealso Clark Lumber Co. v. Thornton, 360 So.2d 1019, 1021
(Ala.Civ.App. 1978) ("the weight and credibility to be attributed to an expert witness is for the trier of fact"). In this case, the trier of fact was the Commission. We also note that while Dr. Brookoff specialized in the treatment of patients with chronic pain, much of his testimony focused on theories regarding the treatment of chronic-pain patients rather than on the specifics of this case, and he did not offer an opinion on all of the issues being considered by the Commission. Dr. McBrearty testified before the Commission with regard to all of the issues being considered, and the Commission members had the opportunity to question Dr. McBrearty regarding his conclusions. The trial court improperly replaced its own judgment for that of the Commission *Page 931 
in assigning weight to the testimony of the experts in this case. The trial court incorrectly determined that the Commission erred "as a matter of law" in relying on Dr. McBrearty's testimony with regard to this issue.
Having concluded that the trial court improperly determined that the Commission had erred "as a matter of law" with regard to whether the evidence discussed above could serve to support the charges leveled against Dr. Herrera by the Board, we next turn to the issue whether the Commission's April 25, 2001, order was supported by substantial evidence. See Ex parte MedicalLicensure Comm'n of Alabama, supra.
In Ex parte Medical Licensure Commission of Alabama, supra, the trial court reversed a Commission order revoking the medical license of a doctor accused of sexual misconduct. This court affirmed the trial court's judgment without an opinion. SeeMedical Licensure Comm'n of Alabama v. Almeida, 897 So.2d 1091
(Ala.Civ.App. 2003) (table). Our supreme court reversed this court's judgment, concluding that the evidence supported the Commission's decision to revoke the physician's medical license. In so holding, our supreme court emphasized the role of the Commission as the trier of fact, stating:
 "While this Court acknowledges that there were some inconsistencies in the testimony presented to the Commission, . . . the resolution of conflicting evidence is within the exclusive province of the Commission. This rule is premised on the proposition that the trier of fact — here the Commission — is in the best position to observe the demeanor and credibility of the witnesses, especially in this case where the members of the Commission were members of the profession being regulated. The members of the Commission not only observed the proceedings, they also engaged in the proceedings by rigorously questioning [several of] the witnesses after the attorneys had completed their examination of [those] witnesses."
Ex parte Medical Licensure Comm'n of Alabama, 897 So.2d at 1099
(citations omitted) (emphasis added).
In reaching its determination that Dr. Herrera had violated several subsections of § 34-24-360, Ala. Code 1975, the Commission made several factual findings. The trial court disagreed with each of those factual findings. As the facts detailed in the first portion of this opinion indicate, the evidence was in dispute regarding every allegation and charge at issue in this case.
A reexamination of the many details of that evidence is not necessary. There was evidence in the record, from the testimony of the witnesses, the documentary exhibits, and the questioning of Dr. Herrera by the Commission members, that would support a conclusion that Dr. Herrera routinely ordered unnecessary diagnostic tests for some of his patients. Although Dr. Herrera and Dr. Brookoff testified that Dr. Herrera's prescription of opiate and narcotic medications for his chronic-pain patients was within the Alabama guidelines for the prescription of such controlled substances, there was also evidence tending to indicate that Dr. Herrera routinely ordered unusual combinations or amounts of narcotic pain medicine for those patients.
The evidence pertaining to the prescription of opiate or narcotic pain medication without a legitimate medical purpose would also support the Commission's conclusion that Dr. Herrera practiced medicine in a manner that endangered the health of his patients. In addition, the evidence pertaining to Dr. Herrera's continued prescription of the anti-inflammatory *Page 932 
medication to D.L., during the time when he treated her after she had developed complications associated with that medication, also supports the Commission's conclusion.
In this case, as in Ex parte Medical Licensure Commission ofAlabama, supra, there were disputes and some inconsistencies in the evidence presented by the witnesses. Dr. Herrera explained the reasons for his treatment of the three patients at issue in this matter. Some of those explanations seemed, to this court upon a review of the evidence contained in the record on appeal, to be reasonable based upon the evidence presented in this case. However, the Commission members had the advantage of observing the witnesses as they testified and were best able to determine the credibility of the witnesses. Further, the Commission members questioned Dr. Herrera, Dr. Herrera's office manager, and Dr. McBrearty during those witnesses' testimony during the 2001 evidentiary hearing. In its April 25, 2001, order, the Commission specifically cited as one of the grounds for its decision Dr. Herrera's responses to the questioning by the Commission members. The Commission is comprised of seven physicians and one layperson. See § 34-24-311, Ala. Code 1975. Thus, in addition to observing the witnesses as they testified, the Commission, being composed primarily of "members of the profession being regulated," also had the advantage of evaluating and reviewing the evidence and testimony with a level of expertise not available to the members of this court. Ex parte MedicalLicensure Comm'n of Alabama, 897 So.2d at 1099.
This court, like the trial court, reviewed the cold record of the proceedings conducted before the Commission. Thus, this court is in no better position than was the trial court to determine the credibility of the witnesses or to assign weight to their testimony; such was the function of the Commission. See Ex parteMedical Licensure Comm'n of Alabama, supra. Much deference is to be afforded the Commission's decision, especially given the fact that the members of the Commission have expertise in the profession they are called upon to regulate. Id. Given the evidence in the record, this court might have reached a different result than did the Commission. However, we cannot say that the April 25, 2001, decision of the Commission was not supported by substantial evidence. See Ex parte Medical Licensure Comm'n ofAlabama, supra, and Ex parte Alabama Bd. of Nursing, supra.
In his brief submitted on application for rehearing, Dr. Herrera addresses the issue of the sanction imposed by the Commission.[8] Dr. Herrera refers this court to authority cited in Eley, supra, and invites the court to resolve what he contends is an ambiguity in the law on the issue of whether a court may modify a sanction imposed by the Commission. Dr. Herrera maintains that the sanction imposed against him by the Commission is "unduly harsh" and that this court should "modify" the sanction. Out of an abundance of caution, we address the issue and conclude that the Commission's revocation of Dr. Herrera's license should not be disturbed.
In Alabama Board of Nursing v. Herrick, 454 So.2d 1041
(Ala.Civ.App. 1984), *Page 933 
this court affirmed the Board of Nursing's revocation of a nurse's license. In reaching its holding, this court stated:
 "We are limited in the scope of our review of appealable administrative orders for, ordinarily, courts will only pass upon three issues in such appeals: whether the agency acted within its powers conferred upon it by law and the constitution, whether its decision is supported by substantial evidence, and whether the agency's decision is reasonable and not arbitrary. Little Caesar's Inc. v. Alabama Alcoholic Beverage Control Board, [386 So.2d 224 (Ala.Civ.App. 1979), rev'd on other grounds, 386 So.2d 228 (Ala. 1980)]."
Alabama Bd. of Nursing v. Herrick, 454 So.2d at 1043. This court concluded that it was within the authority and discretion of the Board of Nursing to determine whether to revoke the nurse's license and that the Board of Nursing had not exceeded its authority in deciding to revoke the nurse's license. AlabamaBd. of Nursing v. Herrick, supra.
In State Board of Nursing v. Stejskal, 835 So.2d 1006
(Ala.Civ.App. 2000), this court affirmed a trial court's determination that a decision to revoke a nurse's license by the Board of Nursing was not supported by the evidence. Our supreme court reversed, concluding that in reaching its holding, this court had failed to follow Alabama Board of Nursing v. Herrick, supra. Ex parte Alabama Board of Nursing, 835 So.2d 1010 (Ala. 2001). In so holding, the Supreme court concluded "that the Board's decision to revoke [the nurse's] license was supported by substantial evidence; that it was reasonable; and that it was within the Board's constitutional and statutory authority." Exparte Alabama Bd. of Nursing, 835 So.2d at 1013. Our supreme court determined, among other things, that the Board of Nursing had acted within its discretion in imposing the sanction of the revocation of the nurse's license. Id.
In this case, we have concluded that the Commission's decision was supported by substantial evidence. Dr. Herrera has not maintained that the sanction imposed by the Commission was not within its constitutional or statutory authority. Given the nature of the Commission's factual findings with regard to Dr. Herrera's actions, we must conclude that the Commission's decision to revoke Dr. Herrera's medical license was reasonable and within the Commission's discretion. See Ex parte Alabama Bd.of Nursing, supra; Alabama Bd. of Nursing v. Herrick, supra. A reviewing court,
 "in reviewing the action of an administrative agency[,]does not pass upon the wisdom of the decision of the agency [,]nor is it within the purview of courts to pass upon the merits of a particular action of an administrative agency when the agency exercised its discretion in choosing the method of achieving legislative objectives."
Alabama Bd. of Nursing v. Herrick, 454 So.2d at 1043. The judgment of the trial court is reversed, and the cause is remanded for the entry of a judgment consistent with this opinion.
OPINION OF MARCH 11, 2005, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; REVERSED AND REMANDED.
PITTMAN and BRYAN, JJ., concur.
CRAWLEY, P.J., and MURDOCK, J., concur in the result, without writing.
[1] The record contains no indication of the reason for the delay between Dr. Herrera's timely appeal of the Commission's order to the trial court and the entry of the trial court's judgment.
[2] Dr. Herrera testified that D.L. told him that the hospital had performed no tests on her. Dr. Herrera testified that given D.L.'s level of distress he did not inquire about the hospital that treated her following her 1996 automobile accident. Dr. Herrera stated that he saw no point in attempting to obtain any of D.L.'s records from that hospital. In response to questioning by the Commission, Dr. Herrera testified that he believed that D.L. could have been hospitalized for two days in a facility that did not have x-ray capabilities because, he asserted, some rural Georgia hospitals were "like tents, almost." In response to other questioning, Dr. Herrera responded that he would be surprised to learn that the hospital that treated D.L. was accredited and employed 92 people.
[3] Dr. Herrera suffered a brain injury as a result of a June 11, 1997, automobile accident. Dr. Herrera remained off work from June 11, 1997, until mid-August 1997 as a result of the injuries he sustained in that automobile accident. Other doctors covered Dr. Herrera's medical practice during that time. This opinion occasionally refers to those doctors' treatment of Dr. Herrera's patients during that time period.
[4] This court does not reach the issue whether the trial court correctly stated the law in asserting in its judgment that the Board was required to prove its charges against Dr. Herrera by a "preponderance of the evidence."
[5] Section 34-24-360, Ala. Code 1975, allows the Commission to revoke or suspend a doctor's medical license under certain conditions. That section provides, in pertinent part:
 "The Medical Licensure Commission shall have the power and duty to suspend, revoke, or restrict any license to practice medicine or osteopathy in the State of Alabama or place on probation or fine any licensee whenever the licensee shall be found guilty on the basis of substantial evidence of any of the following acts or offenses:
". . . .
 "(3) Practicing medicine or osteopathy in such a manner as to endanger the health of the patients of the practitioner.
". . . .
 "(8) Distribution by prescribing, dispensing, furnishing, or supplying of controlled substances to any person or patient for any reason other than a legitimate medical purpose.
". . . .
 "(11) Performance of unnecessary diagnostic tests or medical or surgical services.
". . . ."
[6] Dr. McBrearty, as well as some of the members of the Commission, questioned whether the documentation in the patient charts justified the diagnostic tests Dr. Herrera ordered. More significantly, Dr. McBrearty testified that many of the tests Dr. Herrera ordered were identical and were ordered routinely, that those tests were unnecessary for the documented concern, and that Dr. Herrera's treatment of the patient rarely altered as a result of the testing. Some members of the Commission also questioned whether some tests Dr. Herrera ordered were appropriate for the condition or for the use for which he ordered them.
[7] We note that even some of Dr. Brookoff's testimony called Dr. Herrera's prescription of some medications into question.
[8] Dr. Herrera also raised three other arguments on application for rehearing. Those issues were adequately addressed in this court's March 11, 2005, opinion, which we are today withdrawing. The discussion of those arguments has been retained in this opinion and we decline to readdress them on rehearing. *Page 934